**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
IN RE AMGEN INC.,
                    Putative Defendant.
-------------------------------------------------------X

**REPORT AND**
**RECOMMENDATION**

10-MC-0249 (SLT) (JO)

**JAMES ORENSTEIN, Magistrate Judge:**

Petitioner Amgen, Inc. ("Amgen") seeks a protective order against the federal government. Specifically, Amgen contends that government lawyers involved in an investigation of the company – both before the grand jury and in connection with *qui tam* litigation here and elsewhere – have violated Rule 4.2 of the New York Code of Professional Responsibility, also known as the "no-contact" rule, and intend to continue doing so. On that basis, Amgen asks the court to impose on the federal government – rather than on any particular attorneys – prophylactic measures to ensure that future contacts between the government and Amgen employees will conform to the requirements of Rule 4.2. Docket Entry ("DE") 1 ("Motion"). On referral from the Honorable Sandra L. Townes, United States District Judge (to whom the case was assigned in her capacity as the Miscellaneous Judge on duty on the date the motion was filed, pursuant to Local Rule 50.5(a)), I now make this report and, for the reasons set forth below, respectfully recommend that the court dismiss the motion on the ground that it lacks authority either to act on the motion or to grant the requested relief. Alternatively, in the event the court concludes that it has sufficient authority to address the merits, I respectfully recommend that the court deny the motion both because the record does not demonstrate that any attorney has violated the applicable rule and because any violation, if shown, does not warrant the relief Amgen seeks.

I.    <u>Background</u>

The instant motion arises from a disagreement about the meaning of the "no-contact" rule of New York's Code of Professional Responsibility, which provides as follows:

> In representing a client, a lawyer shall not communicate or cause another to communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the prior consent of the other lawyer or is authorized to do so by law.

N.Y. Rules of Prof'l Conduct 4.2(a), 22 N.Y.C. R.R. § 1200 ("Rule 4.2"). By its terms, Rule 4.2 governs the conduct of all attorneys admitted to practice in the State of New York. It also applies, by virtue of this court's local rules, to all attorneys admitted to practice in this district regardless of admission to the New York bar. *See* Loc. Civ. R. 1.5(b)(5) (providing for imposition of disciplinary sanctions on "any attorney … found to have engaged in conduct violative of the New York State Rules of Professional Conduct as adopted from time to time by the Appellate Divisions of the State of New York"). Moreover, by operation of federal statutory law, Rule 4.2 also governs the conduct of any attorney for the federal government who "engages in" her "duties" in New York regardless of whether she is or is not admitted to practice in this district or state. *See* 28 U.S.C. § 530B(a) (the "McDade Act").[1] In seeking relief, Amgen takes the position that the government, in the course of conducting an investigation of the company's conduct, has been violating Rule 4.2 and will continue to do so unless ordered to stop.

The parties largely agree about the essential facts pertinent to the instant dispute. Amgen, a large corporation in the biotechnology industry, is a named defendant in several lawsuits filed in this district and elsewhere by private individuals pursuant to the *qui tam* provision of the False

---

[1] Both Amgen and the government refer to the statute as the "McDade Amendment," after its chief legislative sponsor, former Representative Joseph McDade. As Amgen notes, Amgen Memo. I at 7 & n.2, the statute codified a legislative rejection of the then-current policy of the United States Department of Justice, as set forth in a federal regulation. Because the statute was a wholly new legislative enactment that placed unprecedented control over federal law enforcement in the hands of state bar authorities, *see* Fred C. Zacharias & Bruce A. Green, *The Uniqueness of Federal Prosecutors*, 88 Geo. L. J. 207, 219-22 (2000), and did nothing to amend any prior enactment, I refer to it as a congressional "Act" rather than an "Amendment" to avoid endorsing the implicit suggestion that Congress was simply revising an earlier policy choice.

Claims Act, 31 U.S.C. § 3729 *et seq*. (the "FCA"). One such lawsuit had been unsealed as of the time Amgen filed the instant motion. *United States ex rel. Westmoreland v. Amgen Inc., et al.*, docket no. 06-10972 (D. Mass.) (minute entry dated Nov. 17, 2009) (reprinted in DE 1-2, Declaration of [Amgen Counsel] Michael Kendall ("Kendall Dec.") Ex. A). The United States has declined to intervene in the litigation, *see id*., DE 71 (notice of non-intervention by United States), but its counsel has apparently continued to attend conferences in the case and receive notice of court filings. DE 2 (Memorandum of Support) ("Amgen Memo. I") at 4; DE 10 (Memorandum in Opposition) ("USA Memo. I") at 5, n.2.[2] The government has not yet decided whether to intervene in any of the sealed cases pending in this district, and is apparently conducting an investigation in advance of making that decision.[3] At the same time, the government is assisting a grand jury investigation in this district into the same matters at issue in the *qui tam* lawsuits. Amgen Memo. I at 2.

In support of the latter investigation, federal law enforcement agents have served several grand jury subpoenas on employees of Amgen. Kendall Dec. ¶¶ 3-4. At the same time, agents have sought to interview several current and former Amgen employees – sometimes, but apparently not always, in conjunction with serving a subpoena. *Id*. ¶¶ 6, 12-13, 15. Although the government had

---

[2] On April 23, 2010, the district court dismissed the claims against Amgen and the other defendants in the case. *United States ex rel. Westmoreland v. Amgen, Inc.*, 707 F. Supp. 2d 123 (D. Mass. 2010). The court denied the relator's motion for reconsideration but granted her leave to file an amended complaint. 2010 WL 2204603 (D. Mass. May 26, 2010). The relator subsequently filed a fourth amended complaint, and on July 21, 2010, the court denied defendants' motion to dismiss that complaint. 738 F. Supp. 2d 267, 280-81 (D. Mass. 2010). The relator's case is currently proceeding to trial and in the meantime, the state plaintiffs have appealed the court's April 23, 2010 ruling. *See* 2010 WL 2925888 (D. Mass. July 22, 2010). Although the government has made filings in the case, it has continued to decline to intervene.

[3] Since Amgen filed the instant motion, at least two such cases have been unsealed and dismissed without government intervention. *See United States ex rel. P. Shawn O'Brien, et al. v. Amgen, Inc., et al.*, 09-cv-5323 (JFB) (dismissed on October 7, 2010); *United States ex rel. Darrell Dotson v. Amgen Inc. et al*, 08-cv-5258 (KAM) (dismissed on August 16, 2010).

in the past solicited the assistance of Amgen's counsel in arranging the interviews of Amgen's employees, Kendall Dec. ¶ 12, the government did not do so with respect to the interviews at issue here. *Id.* ¶¶ 13, 15. When Amgen protested, the government expressed its intention to "continue to contact current [Amgen] employees who [sic] we do not know to be represented" by counsel. Kendall Dec. Ex. F (email dated Mar. 5, 2010).[4]

On April 16, 2010, Amgen filed the instant motion for a protective order as a new, free-standing action in this court. Arguing that the government's conduct in interviewing Amgen employees has violated Rule 4.2, the company asked the court to require the government "to coordinate with Amgen's counsel any contact with current Amgen employees;" and to impose two additional conditions on "any contact between the government and current [Amgen] employees:" first, that "[t]he government shall not inquire or discuss [sic] any communications protected by the attorney-client or work product privilege;" and second, that "[t]he government shall abide by the New York Rules of Professional Conduct." DE 1-1 (proposed order); *see also* Kendall Dec.; Amgen Memo I. Judge Townes referred the motion to me on April 30, 2010. DE 3. The government responded to the motion on May 11, 2010. DE 10 ("USA Memo I"). I heard oral argument on the motion on May 14, 2010, and received two rounds of supplemental briefing from both Amgen and the government. *See* DE 7 (minute order); DE 11 ("Amgen Memo II"); DE 12 ("USA Memo II"); DE 14 ("Amgen Memo III"); DE 15 ("USA Memo III").

---

[4] The parties disagree as to whether the government has reneged on an implied promise not to engage in such interviews. *Compare* Kendall Dec. ¶ 8 *with* Ex. D (email from Assistant United States Attorney dated Nov. 5, 2009). Because Amgen does not take the position that the purported promise serves to estop the interviews at issue, I do not discuss the matter further; regardless of any prior discussion on the subject, the government is unwilling to refrain from having its agents interview Amgen employees in the absence of the relief Amgen now requests.

II.     Discussion

A.     Jurisdiction: Supervisory Authority

Amgen has not filed a lawsuit against any defendant, nor has it filed a petition or motion pursuant to any legal authority that explicitly creates a right to seek redress in federal court. Nor, as far as the record reveals, is Amgen a defendant in any pertinent pending action in this district.[5] In filing its motion in the first instance, the company simply asserted that the government's purported violation of Rule 4.2 suffices to allow this court to order the relief it seeks. *See* Amgen Memo. I at 3-7 (factual recitation), 7-13 (argument that the government's conduct violates Rule 4.2), 14 (prayer for relief).

Because this is a court of limited jurisdiction, the nature of Amgen's motion requires that the court first determine the source of its authority to act. *See, e.g. Alliance For Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 85 (2d Cir. 2006) ("a district court must … establish that it has federal constitutional jurisdiction … before deciding a case on the merits") (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998)). Even if Amgen is correct that the attorneys conducting the government's investigation have engaged in conduct that violates New York's no-contact rule, that fact by itself would not warrant judicial intervention. This court has no mandate to supervise the extent to which attorneys admitted to the bar of New York conform their

---

[5]  I address below in part II.B.2 the fact that Amgen may be a named defendant in pending *qui tam* actions in which the United States has yet to make a decision about whether it will intervene as a party plaintiff. If Amgen was a defendant in a *qui tam* action in which the United States had already intervened, then the court would plainly have jurisdiction over the action in which the request was made. In this critical respect, the instant motion differs from the procedural posture of *United States ex rel. O'Keefe v. McDonnell-Douglas Corp.*, 961 F. Supp. 1288 (E.D. Mo. 1997) ("*O'Keefe I*"), *aff'd*, 132 F.3d 1252 (8th Cir. 1998) ("*O'Keefe II*"), in which the court exercised its "inherent authority to impose sanctions for conduct which abuses the judicial process[,]"*O'Keefe I*, 961 F. Supp. at 1291, to grant a similar request to enforce the no-contact rule in the context of a governmental investigation.

conduct to that state's rules of professional responsibility; that is a matter for state disciplinary authorities. Nor does a judge of this court assigned to a matter in her capacity as Miscellaneous Judge enjoy any general supervisory authority over the conduct of attorneys admitted to practice in this district: such enforcement is delegated under the rules of this court to the court's Committee on Grievances. *Compare* Loc. Civ. R. 1.5(a) ("the Committee on Grievances … shall have charge of all matters relating to the discipline of attorneys") *with* Loc. R. 50.5(a) (defining duties of Miscellaneous Judge).[6] Certainly neither Rule 4.2 nor the local rule that incorporates it into the code of conduct for attorneys in this district purports to create a private right of action for enforcement. *See* Rule 4.2; Loc. Civ. R. 1.5(b)(5). Moreover, as a matter of separation of powers, this court has no general mandate to supervise the extra-judicial conduct of federal prosecutors in this district. *See Amnesty Intern. USA v. Clapper*, --- F.3d ----, 2011 WL 941524, at *9 (2d Cir. Mar. 21, 2011) ("If we … simply allowed the courts to 'oversee legislative or executive action,' that would 'significantly alter the allocation of power away from a democratic form of government.'") (quoting *Summers v. Earth Island Inst.*, 129 S. Ct. 1142, 1149 (2009)).[7]

---

[6] In any event, the case-related, prospective, and injunctive relief Amgen now seeks is not the kind of sanction the Committee on Grievances is authorized to impose on the basis of a violation of this district's version of the no-contact rule. *See* Loc. Civ. R. 1.5(c)(1)-(2). Neither is the declaratory relief Amgen seeks as an alternative. *See* Amgen Memo. II at 21. I further address the issues surrounding Amgen's proposed remedies below in part II.C.

[7] Amgen appears to think otherwise, and asserts that this court has some free-standing authority, the provenance of which it does not identify, to countermand an executive branch "policy" on the ground that it "is fundamentally inconsistent with the fair administration of criminal and civil justice and the sanctity of the attorney-client relationship." Amgen Memo. II at 12. In support of the proposition, Amgen cites *United States v. Ming He*, 94 F.3d 782, 793 (2d Cir. 1996), and *Bank of Nova Scotia v. United States*, 487 U.S. 250, 259 (1988). Neither case stands for so broad a proposition, primarily because each arose in the context of the government's prosecution of a specific defendant. If and when the government sues or indicts Amgen, the company can certainly rely on such cases to the extent they support requests for relief against the government in the context of such litigation. But neither case purports to confer on the judiciary the profoundly anti-democratic authority to veto an executive branch policy as such.

Amgen thus relies primarily on two asserted bases for invoking this court's jurisdiction. First, it contends that its motion is made to the Miscellaneous Judge only by virtue of the fact that it lacks sufficient information about the sealed *qui tam* actions to make the request of a judge presiding over one of those cases, and therefore asks the court to exercise the supervisory authority over parties that it claims would empower the latter judges to sanction the government. Amgen Memo. II at 3-7.[8] Second, Amgen contends that this court can and should entertain the motion in the exercise of its supervisory authority over grand jury proceedings in this district. *Id.* at 7-9. As set forth below, I disagree with Amgen on both points.

1.    Supervision Of The Sealed Cases

Amgen first argues that this court has authority to enforce Rule 4.2 because the government is conducting its investigation of the sealed *qui tam* actions under the court's aegis pursuant to the FCA. Critical to this portion of Amgen's argument is the following passage:

> The FCA effectively tolls a *qui tam* plaintiff's obligation to provide service and notice of its Complaint to the defendants and prevents the relator-plaintiff from litigating the case to judgment by creating an *ex parte* and unilateral quasi-discovery process for the benefit of the United States. 31 U.S.C. § 3730(b)(2)-(3). The seal period is not unlimited; the FCA circumscribes this discovery period to 60 days as of right. *Id.* § 3730(b)(2) ("The complaint shall be filed *in camera*, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders.") After this initial period, the United States may only conduct its investigation under seal by invoking the jurisdiction of the supervising court to show why "good cause" exists to allow a motion to extend the seal period. *See id.* § 3730(b)(3). As a result, the FCA specifically contemplates a federal court's supervision and jurisdiction over the United States' reliance on this statutorily created discovery process to conduct its investigation. Based on information and belief, the United States has availed itself of the supervising court's jurisdiction to extend the seal period by motion on multiple occasions.

Amgen Memo. II at 4 (footnote omitted).

---

[8] As discussed below, I assume for purposes of analysis that this court may exercise the same supervisory authority over the parties to the sealed *qui tam* actions in this district as could the judges assigned to those actions.

The argument, although superficially quite persuasive, is ultimately a sleight-of-hand that conflates the government's pre-existing duty to conduct an investigation of potential violations of the False Claims Act with the sealing of a private relator's complaint during that investigation. Key to the illusion is the omission of any reference to the following provision of the FCA: "The Attorney General diligently shall investigate a violation under section 3729." 31 U.S.C. § 3730(a). That directive is entirely independent of the provisions conferring a private right of action on *qui tam* relators.

The other key element of Amgen's gambit is the assertion that the FCA creates "an *ex parte* and unilateral quasi-discovery process for the benefit of the United States." Amgen Memo. II at 4 (citing 31 U.S.C. § 3730(b)(2)-(3)). The FCA does not confer on the government any discovery rights – "quasi-" or otherwise – that spring into existence upon the filing of a private relator's complaint under seal. Rather, the government has a statutory right, and indeed an obligation, that exists regardless of the pendency of a sealed complaint, to conduct its own investigation. The sealing provision thus does no more than stay the relator's litigation while the government discharges its independent investigative duty, and provides a mechanism for the government to extend the presumptive duration of that stay by informing the court of the need to do so. The statute does not in any way create a judicially-supervised discovery process that begins prior to the government's decision about whether to join the case as a party plaintiff. Thus, to the extent that the court does anything at all while a relator's complaint remains under seal, one thing it assuredly does not do is supervise the government's investigation. It may determine that there is good cause

to maintain the seal while the government continues its investigation, but in doing so it does not put its imprimatur on the quality of the investigative techniques.[9]

Nor does the court in which the relator's complaint is filed under seal supervise the government's investigation by virtue of the government's statutory authority to issue (and seek the enforcement of) a civil investigative demand ("CID"). *See* Amgen Memo. II at 4-5 (citing 31 U.S.C. § 3733). As the statute makes explicit, the enforcement of such demands is *not* committed to the court in which a relator's complaint may be pending – indeed, there may be no such complaint at all – but rather to the court in the district in which the demand recipient resides, can be found, or transacts business.[10] The statute thus divorces judicial enforcement of the government's investigative powers from oversight of the relator's complaint – even where those two functions might occur in the same judicial district, as I am prepared to assume they do here.[11]

---

[9] Amgen originally purported to seek a protective order pursuant to Federal Rule of Civil Procedure 16. Motion at 1. At oral argument, however, Amgen conceded that Rule 16 does not apply at this stage of the sealed *qui tam* proceedings. *See* Tr. at 18. In its later submission, Amgen appeared to hedge a bit on that concession, allowing only that because "the FCA itself provides for judicial supervision of this *ex parte* discovery process, the court need not reach the issue of whether a protective order in this case can issue pursuant to Rule 16." Amgen Memo. II at 4-5 n.2. Because I reject Amgen's contention that the FCA creates an "*ex parte* discovery process" I must indeed reach the Rule 16 issue. To the extent Amgen no longer concedes the matter, I conclude that Rule 16 is not a source of authority for the relief Amgen seeks. The latter rule concerns the discovery process that begins only after parties to a civil action have had a discovery planning conference. *See* Fed. R. Civ. P. 26(d)(1), (f). None of the sealed *qui tam* actions can have reached that stage by virtue of the fact that they remain sealed even from Amgen.

[10] In addition to arguing about the significance of civil investigative demands issued under Section 3733, Amgen also refers to the issuance of subpoenas pursuant to Section 3731(a). Amgen Memo. II at 4-5. However, the FCA does not authorize the government to issue subpoenas to further its pre-intervention investigation; it merely provides that any party to a *qui tam* action may issue a subpoena "requiring the attendance of a witness *at a trial or hearing* conducted under section 3730 of this title [that] may be served at any place in the United States." 31 U.S.C. § 3731(a) (emphasis added).

[11] Because I make that assumption, Amgen's complaint that the government has improperly denied it access to the docket of sealed *qui tam* cases in this district is of no moment. Amgen argues that this court has jurisdiction to grant the relief it seeks pursuant to Local Rule 50.5

Of course, the argument can be made that a judge of this court supervising a given *qui tam* action could give her imprimatur to the government's investigative methods, and therefore might supervise its attorneys, because it may be called upon to enforce a CID. Indeed Amgen makes just such an argument by analogy to the rule governing the return of property seized pursuant to a warrant. *See* Amgen Memo. II at 6-7 (citing Fed. R. Crim. P. 41(g) and cases applying it). The analogy is inapt: the latter rule explicitly empowers a court to "return the property to the movant" – thereby foreclosing any objection that the court lacks authority to act. The FCA confers no comparable right either on the defendant named in a relator's sealed complaint or, more importantly, on the subject of the Attorney General's independent investigation.

The closer analogy is to the court's supervisory authority over grand jury proceedings. In that context, as here, the law explicitly provides that the government may invoke the court's

---

because its lack of information about the sealed cases prevents it from seeking relief from the judges presiding over those actions. See Amgen Memo. II at 3, 6-7. That argument necessarily fails if the judge to whom a given sealed complaint is assigned would lack supervisory authority to grant relief – and as explained above and below, I conclude that that is the case. In other words, I assume that Amgen is correct to the extent it means to argue no more than that the judge assigned to this miscellaneous action may exercise the same supervisory authority over the government as would any judge in this district presiding over a private relator's sealed *qui tam* action. I simply conclude that the latter judge has no such supervisory authority.

I note, however, that I disagree with Amgen's assertion that the government has acted unlawfully in withholding docketing information about the sealed cases. First, Amgen cites no authority for the proposition that the government has any obligation to disclose such information, and I am aware of none. Second, it is not the government that has withheld such information, it is the court, which controls the extent to which information on the docket is made available to the public. If the court makes docket information available to the public, Amgen needs no help from the government to retrieve it; but if the court determines that docket information should be sealed, a government attorney would violate the law to reveal it to Amgen or anyone else outside of the government. Third, the dissemination of such docket information during the sealing period would plainly undermine the established societal benefits of the secrecy of grand jury and law enforcement investigations. Regardless of what Amgen might do with such information (and I assume it would make no improper use of it), a rule requiring the government to reveal the existence of sealed *qui tam* complaints would jeopardize the efficacy of investigations into suspected corporate crimes and would understandably chill the willingness of employees and others to report such crimes.

authority to vindicate its rights to secure evidence by means of an investigative demand (a CID here, a subpoena in the grand jury context), but it does not explicitly provide that the court therefore has supervisory authority over all aspects of the manner in which the government conducts its investigation. However, in the grand jury context, as discussed in greater detail below, the Supreme Court has decided that there is no such connection: as a matter of separation of powers, the court's supervisory authority over the conduct of the government's investigation is limited to "those 'few, clear rules which were carefully drafted and approved by [the Supreme] Court and by Congress to ensure the integrity of the grand jury's functions[.]'" *United States v. Williams*, 504 U.S. 36, 46 (1992) (quoting *United States v. Mechanik*, 475 U.S. 66, 74 (1986) (O'Connor, J., concurring)).

I conclude the same rationale applies here as well. The court's authority to enforce a CID under the FCA – an authority that exists regardless of the pendency under seal of a private relator's *qui tam* action – does not create out of whole cloth supervisory authority over the conduct of an investigation that the Attorney General is required to conduct but that may never result in the government filing an action in this court or any other. Even assuming that there remain any sealed *qui tam* actions against Amgen in this district, the pendency of such actions does not itself confer on any judge of this court the power to sanction the government (or its individual attorneys) for a violation of the no-contact rule committed in the course of a pre-intervention investigation.

2.      Supervision Of The Grand Jury

Amgen argues that because the government's investigation is at least partially in support of a proceeding before a federal grand jury empanelled in this district, the court may grant the relief Amgen seeks in the exercise of its inherent authority to supervise such proceedings. *See* Amgen

Memo. II at 7-13. In making that argument, Amgen does not ignore the Supreme Court's decision in *Williams* – or at a minimum, it stopped ignoring the case once I inquired about it at oral argument, *see* Tr. at 13-14 – but rather seeks to reconcile its position with the extremely limited vision of such supervisory authority the Court described in that case. Here again, Amgen's argument is unpersuasive.[12]

In *Williams*, the district court dismissed an indictment without prejudice because the prosecutor had failed to present materially exculpatory evidence to the grand jury, and the circuit court affirmed. 504 U.S. at 39-40. In his petition for certiorari, the defendant argued that the lower courts' view that the prosecution had an affirmative duty to disclose exculpatory evidence to the grand jury was supported by the courts' supervisory power. *Id*. at 45. The Supreme Court's response was succinct and unequivocal: "We think not." *Id*.

The rationale for the Court's decision in *Williams* was simple: courts deploy supervisory authority "to control their *own* procedures," *id*. (emphasis in original), but they cannot use their supervisory power to prescribe standards of prosecutorial conduct before the grand jury "[b]ecause

_____

[12] Amgen begins its argument about supervision of the grand jury by referring to the "federal court's traditional role in supervising a grand jury *and its 'investigative function.' See Morrison v. Olson*, 487 U.S. 654, 681 n.20 (1988); *United States v. Williams*, 504 U.S. 36, 46-47 (1992)." Amgen Memo. II at 7 (emphasis added). To the extent Amgen intends to convey no more than that in the cited cases, the Supreme Court referred to a tradition of judicial oversight of the grand jury as an institution and also used the words "investigative function," the sentence is correct but immaterial. To the extent Amgen intends the passage to suggest that the cited decisions purported to assert judicial supervisory authority over the "investigative functions" of a grand jury – the only point that, in context, would be relevant to Amgen's argument – it is affirmatively misleading. The cited footnote in *Morrison* did no more than observe in dicta that "federal courts have traditionally supervised grand juries *and assisted in* their 'investigative function' by, if necessary, compelling the testimony of witnesses." 487 U.S. at 681 n.20 (emphasis added). And, as discussed further below, the Court in *Williams* explained in detail that federal courts have *no* general supervisory authority over the grand jury's investigative process. Indeed, the only use of the term "investigative function" in *Williams* occurs in Justice Stevens' dissent, in which he expresses the view that, contrary to the majority's judgment, federal courts do enjoy such supervisory authority. 504 U.S. at 66 (Stevens, J. dissenting).

the grand jury is an institution separate from the courts, over whose functioning the courts do not preside[.]" *Id*. at 47. Yet that is precisely the sort of power Amgen asks this court to exercise: it seizes on the fact that this court has incorporated New York's formulation of Rule 4.2 into its own local rules to govern the conduct of attorneys in this court and seeks to use that as basis for concluding that the court has also prescribed the same standard for prosecutors appearing before the grand jury the court empanelled. Viewed in that light, the exercise of supervisory authority Amgen proposes is irreconcilable with the decision in *Williams*.

Amgen quotes selectively from *Williams* in seeking to avoid the effect of its reasoning. Thus, Amgen acknowledges that the court cannot prescribe standards of prosecutorial conduct before the grand jury in the first instance, but then asserts that it retains "inherent power over the grand jury process 'as a means of enforcing or vindicating legally compelled standards.'" Amgen Memo. II at 8 (quoting *Williams*, 504 U.S. at 46-47). It then goes on to note that the Supreme Court listed a number of such rules within Federal Rule of Criminal Procedure 6 "[b]y way of example," and observes that the reference to Rule 6 was "not limitative." *Id*. Having thus widened the scope of the court's supervisory power over the grand jury, it is an easy next step for Amgen to demonstrate that "[t]he no-contact rule is thus of the type of legally compelled standard that … prosecutors must abide by when conducting a grand jury investigation[.]" *Id*.

In so arguing, Amgen seizes on key phrases from the opinion in *Williams* and uses them in ways that are plainly at odds with its rationale. Moreover, in suggesting that the examples of "legally compelled standards" the Supreme Court culled from Rule 6 were not "limitative," Amgen ignores the fact that the Court referred only to provisions of Rule 6 and the federal criminal code as rules that the court has supervisory power to vindicate. *See* 504 U.S. at 46 n.6. In addition, the

opinion makes clear that however much broader the category of such standards might be, it is not broad enough to include a state's rules of professional responsibility. To the contrary, the Court explicitly wrote that it was referring only to "those 'few, clear rules which were carefully *drafted by this Court and by Congress to ensure the integrity of the grand jury's functions*.'" *Id*. at 46 (emphasis added) (quoting *Mechanik*, 475 U.S. at 74 (O'Connor J., concurring)). Rule 4.2 was written by neither the Supreme Court nor Congress, and it was not designed to safeguard the integrity of the grand jury's functions. Indeed, as Amgen observes, the supervision it seeks to invoke would have *no* effect on the functions of the grand jury itself. *See* Amgen Memo. II at 9.

In the preceding discussion, I have assumed that there is at least some cognizable link between the conduct of which Amgen complains and the proceedings before the grand jury it assumes the court can supervise. But that assumption is hardly warranted. In *Williams*, the defendant sought to invoke the court's supervisory authority to regulate the content of evidence placed before the grand jury for consideration. Here, the request is even further removed from the grand jury room itself: Amgen seeks to regulate the process by which prosecutors decide whom to consult before searching for evidence that may (or may not) be presented to the grand jury for consideration. Even if *Williams* had not placed such strict boundaries around the court's supervision of the grand jury, it is hardly apparent that a federal court would have the broad regulatory power over executive branch investigators that Amgen proposes.

Amgen cites two cases for the proposition that "federal courts often exercise supervisory jurisdiction over a grand jury's investigatory process without running afoul of *Williams*." Amgen Memo. II at 9 (citing *New York Times Co. v. Gonzales*, 459 F.3d 160, 166 (2d Cir. 2006); *In re Grand Jury Investigation*, 59 F.3d 17, 19 (2d Cir. 1995)). Neither of the cases it cites is apposite.

The decision in *Gonzales* involved the existence of jurisdiction under the Declaratory Judgment Act, not supervisory authority, and the opinion in that case did not mention or purport to interpret *Williams*. Nor did either the district court or the circuit court invoke supervisory authority over the grand jury as the basis for the *In re Grand Jury Investigation* decision. In that case, two state agencies that had provided documents in response to a grand jury subpoena sought to compel the prosecutors who retained those documents to provide access to them. 59 F.3d at 18. The district court granted the motion, reasoning that since the government had obtained the documents as a result of the court's use of its "inherent supervisory powers over the use of process to compel the presence of witnesses and evidence[,]" it could use that same power to grant relief to the state agencies. *Id*. at 19. The circuit court affirmed for a different reason: the documents remained the property of the producing agencies, and those agencies therefore had a right of access to them. *Id*. Thus, to the extent *In re Grand Jury Investigation* says anything at all about a court's supervisory power, it says no more than what *Williams* took as a starting point: federal courts have supervisory authority "to control their *own* procedures." *Williams*, 504 U.S. at 45.

*Williams* held that the grand jury is not a part of the judiciary, but rather a separate institution unto itself. The court therefore observed that "it should come as no surprise that [it has] been reluctant to invoke the judicial supervisory power as a basis for prescribing modes of grand jury procedure" and has rejected "all" such invitations to do so, "including some more appealing than" the one Williams presented. *Id*. at 49-50. I respectfully recommend that this court should likewise reject the proposition that it has the authority to supervise conduct far more peripheral to the grand jury's function than that at issue in *Williams*.

B.    Merits

If the court accepts the preceding analysis, it need not address the merits of Amgen's motion. In the event the court disagrees with some or all of that analysis, I respectfully recommend that it deny the motion on the merits. As explained below, I do so for two reasons based on the text of Rule 4.2. First, the no-contact rule only applies to the conduct at issue here if the United States and Amgen can properly be considered to be "part[ies]" to the same "matter." I conclude that under the established case law of this jurisdiction, they are not. Second, the established case law of this jurisdiction also supports the government's view that its attorneys, in allowing investigative contacts with Amgen's employees are in any event "authorized to do so by law." I address each issue in turn after first discussing the underlying assumptions about the operation of the no-contact rule in this case that I make in Amgen's favor.

1.    Preliminary Issues

As a preliminary matter, I note that the following analysis rests on two assumptions, both of which favor Amgen. First, I assume that government attorneys have in fact engaged in communications with Amgen employees within the meaning of the rule. That proposition is by no means obvious: Amgen does not identify any prosecutor who has engaged in a "communication" to which Rule 4.2 applies. Instead, as far as I can discern from the record, Amgen rests its motion on communications between federal law enforcement agents and Amgen employees, and on the theory that such communications are inherently attributable to any prosecutor involved in the investigation. *See* Kendall Dec. ¶ 6 (asserting that "government agents" interviewed unspecified Amgen employees); *id.* ¶ 10 (asserting that "government investigators" and "government agents" contacted Amgen employees directly); *id.* ¶ 13 (asserting that "government agents" contacted a

specific Amgen employee); *id.* ¶ 15 (asserting that "federal agents tried to interview" one Amgen employee and that "the government tried to" interview two others); *see also* Tr. at 15-16, 35-36.

Such reasoning overlooks an important fact about law enforcement investigations: while prosecutors and agents can and often do work closely together in such endeavors, not every action by a law enforcement agent can or should be considered conduct of the prosecutor for purposes of assessing the latter's adherence to rules of professional responsibility. *See* 28 C.F.R. § 77.4(f) (prohibiting prosecutors from "direct[ing] an investigative agent … to engage in conduct … that would violate the attorney's obligations" but permitting them "in good faith [to provide] legal advice or guidance upon request to an investigative agent").[13] Nevertheless the record does support the proposition that the prosecutors here have "ratified" the agents' communications by insisting, in the face of Amgen's complaints, that their agents are free to continue the practice of conducting employee interviews without notice to Amgen's counsel. Under New York's professional responsibility rules, that appears to suffice to establish the existence of communications for which the prosecutors are responsible. *See* N.Y. Rules of Prof'l Conduct 5.3(b)(1), 22 N.Y.C. R.R. § 1200 (a lawyer is responsible for the conduct of a non-lawyer, including an investigator, if she "orders or directs the specific conduct or, with knowledge of the specific conduct, ratifies it").[14]

---

[13] The quoted regulation was promulgated to implement the McDade Act. *See* Ethical Standards for Attorneys for the Government, 64 Fed. Reg. 19,275 (Apr. 20, 1999); 28 U.S.C. 530B(b). As a result, in contrast to the situation in *O'Keefe II*, there can be no reasonable argument that the Justice Department was not authorized to promulgate the regulation.

[14] At oral argument, Amgen's counsel suggested that federal agents could continue to conduct investigative interviews of the employees of represented corporations only in "investigations with no prosecutor assigned[.]" Tr. at 36. On the other hand, Amgen takes the position that a federal prosecutor violates Rule 4.2 when a law enforcement agent working on an investigation, having been asked to serve a subpoena on an employee of a represented corporation and having been given no direction beyond that by the prosecutor, independently contrives to engage in substantive

Second, I assume that in communicating with Amgen employees, government agents have communicated with Amgen itself. In the context of a corporate client, the New York Court of Appeals has defined a "party" to include "corporate employees whose acts or omissions in the matter under inquiry are binding on the corporation (in effect, the corporation's 'alter egos') or imputed to the corporation for purposes of its liability, or employees implementing the advice of counsel." *Niesig v. Team I*, 76 N.Y.2d 363, 374 (1990); *Estes v. City of New York*, 2006 WL 2299350, at *1 (E.D.N.Y. Apr. 11, 2006).[15]

---

communications with the employee. See Tr. at 35-36. That position is potentially quite antithetical to the legitimate interests of those who find themselves under investigation and choose to engage counsel (Amgen would apparently provide no similar protection to persons who lack either knowledge of an investigation or the resources to engage counsel – that is, the persons most in need of protection from government overreaching). In the regime Amgen proposes, the investigative techniques available to a sovereign would be constrained by Rule 4.2 *only* when the sovereign chooses to have a prosecutor provide legal guidance to the investigation. Because Rule 4.2 regulates only attorneys and does nothing to constrain law enforcement agents acting as such, *see United States v. Thompson*, 35 F.3d 100, 104 (2d Cir. 1994), Amgen's broad interpretation of the no-contact rule would do nothing to reduce the government's ability to make contacts with investigative subjects – it would simply give the government a perverse incentive to have those contacts take place without an opportunity for prosecutors to ensure that they occur within the bounds of the law.

[15] In a very narrow sense, the court in *Niesig* interpreted a version of the "no-contact" rule that is no longer in effect: namely, former Disciplinary Rule 7-104(a). *See Niesig*, 76 N.Y.2d at 367-68 & n.1. As far as I am aware, no court has yet revisited the definition of "party" since New York amended the no-contact rule in 2009. Although one court explicitly applied the *Niesig* definition of "party" after the adoption of Rule 4.2, it did so only with respect to a communication that predated the rule's amendment. *See Arista Records LLC v. Lime Group LLC*, 715 F. Supp. 2d 481, 499 (S.D.N.Y. 2010). Given that the text of Rule 4.2 is substantially the same as the language of the rule it superseded – and in particular given the fact that it preserves the earlier rule's use of "party" rather than adopting the Model Rule's reference to a represented "person" – I assume for purposes of this discussion that the definition of "party" in *Niesig* remains authoritative in New York. That assumption accords with the understanding that New York did not intend to effect any substantive change in the no-contact rule in amending and re-numbering it in 2009. *See generally All Star Carts and Vehicles, Inc. v. BFI Canada Income Fund*, 2010 WL 2243351, at *3 n. 2 (E.D.N.Y. June 1, 2010) ("[T]he new rules still incorporate much of the substance of the old rules, and much of the precedent interpreting the old rules still remains applicable.") (internal quotations and citations omitted).

The government contends that this court need not accept as binding the "alter ego" definition because "federal law, not New York State law, controls the interpretation of Rule 4.2 in connection with federal investigations and in matters concerning federal government attorneys in federal courts." USA Memo. II at 2. In so arguing, the government relies primarily on the decision in *Grievance Comm. for S. Dist. of New York v. Simels*, 48 F.3d 640 (2d Cir. 1995). In *Simels*, the court unequivocally held that federal courts have an independent interest in defining the no-contact rule for themselves, even where they explicitly incorporate such rules from state law. *Id*. at 649. But reliance on *Simels* does not suffice in the wake of the McDade Act: that statute requires a government attorney to conform to a welter of ethics rules, not only the set of rules adopted by the particular federal court in which she practices. *See* 28 U.S.C. § 530B(a) ("An attorney for the Government shall be subject to State laws and rules, and local Federal court rules, governing attorneys in each State where such attorney engages in that attorney's duties, to the same extent and in the same manner as other attorneys in that State.").

Thus, while I agree with the government that the version of the no-contact rule adopted by this court need not have as broad a definition as New York State – and even though I believe this court would be well advised to embrace a narrower definition for much the same reason set forth in *Simels*[16] – the point is immaterial. The government attorneys involved here manifestly engage in

---

[16] As a policy matter, the cost of applying the *Niesig* "alter ego" rule may be intolerably high. For example, in the context of an investigation in which both a corporation and one of its employees face potential criminal liability, the broad definition of party might severely disadvantage the individual target by making it impossible for his attorney to get access to other employees with information vital to a defense – particularly a defense that would shift blame to the employer. This is precisely the kind of policy consideration that the *Simels* court – citing *Niesig* – explicitly endorsed. 48 F.3d at 651 (declining to adopt an "interpretation of 'party' [that] might well bar defense counsel from contacting represented co-targets during the investigative phase of a large conspiracy") (citing *Niesig*, 559 N.Y.S.2d at 497 for the proposition that the "cost of [a] broad construction of the term 'party' is reduced access to vital information"). Nevertheless, in passing

their duties in New York State, and must therefore conform to New York State's version of Rule 4.2 *in addition* to this court's potentially narrower version of the same rule. Indeed, this appears to be consistent with the interpretation the Justice Department itself embraces where its attorneys are conducting an investigation but the government is not yet a party to any case. *See* 28 C.F.R. § 77.4(c)(1) ("Where no case is pending, the attorney should generally comply with the ethical rules of the attorney's state of licensure, unless application of traditional choice-of-law principles directs the attorney to comply with the ethical rule of another jurisdiction or court, such as the ethical rule adopted by the court in which the case is likely to be brought.").

### 2. "Party" And "Matter"

New York's no-contact rule regulates the communications a lawyer may have with a "party" she knows to be represented by "another lawyer in the matter[.]" Rule 4.2.[17] Accordingly,

---

the McDade Act, Congress effectively delegated to the several states the responsibility for making such important decisions about the conduct of federal law enforcement investigations.

[17] Although the title of New York's no-contact rule is "Communication With *Person* Represented By Counsel," Rule 4.2 (emphasis added), the text of the rule refers only to a represented "party." The discrepancy may reflect the fact that when New York was considering an overhaul to its rules of professional responsibility so as to track more closely the American Bar Association's Model Rules of Professional Conduct (in which the corresponding version of Rule 4.2 refers to a "person" rather than a "party" in both the title and text), it initially proposed changing "party" to "person" in the text of the no-contact rule, but ultimately decided not to do so in adopting the final version of the rule. *See* New York State Bar Association, Committee on Standards of Attorney Conduct: Proposed New York Rules of Professional Conduct, R. 4.2, Reporter's Notes (2007), *available at* http://www.nysba.org/AM/Template.cfm?Section=Proposed_New_York_Rules_of_Professional _Conduct_Approved_Nov_3_2007&Template=/CM/ContentDisplay.cfm&ContentID=15179 (last visited April 6, 2011); *cf. In re Chan*, 271 F. Supp. 2d 539, 544 (S.D.N.Y. 2003) (noting that notwithstanding the Model Rule's amendment in 1995 "to prohibit a lawyer from communicating with a 'person,' rather than a 'party' known to be represented, …. [the text of the predecessor to New York's Rule 4.2] continues to read 'party,' and we are bound by the [federal] Court of Appeals' interpretation of that text in *Simels*."); Gordon Mehler, John Gleeson, & David C. James, *Federal Criminal Practice: A Second Circuit Handbook*, § 10-3 at 176-77 (11th ed. 2011) (noting that "in 1999, the New York State Appellate Division rejected a proposed amendment to [the no-contact rule] that would have expanded the coverage of the rule from represented 'part[ies]' to represented 'person[s].'"). The important distinction between "party" and "person" in this context appears to

even if the instant action is properly before the court, Amgen cannot obtain relief unless it shows that it is a "party" to the same "matter" as the government. As discussed below, I conclude that it has not met that requirement: the government is not a party to the various pertinent *qui tam* actions because it has not intervened in any of them, and Amgen is not a party to the grand jury investigation.[18]

a.     The *Qui Tam* Actions

I assume for purposes of analysis that Amgen is a "party" within the meaning of Rule 4.2 to the various *qui tam* actions initiated by private relators in this district that remain under seal, and it is unquestionably a party to the unsealed cases here and in Massachusetts. The United States, however, is not. In some of the cases it has explicitly declined the opportunity to become a party or has at least allowed the case to be dismissed without having intervened. *See United States ex rel. Westmoreland*, 707 F. Supp. 2d 123; *United States ex rel. P. Shawn O'Brien*, 09-cv-5323; *United States ex rel. Darrell Dotson*, 08-cv-5258. In those that remain under seal, it is continuing to decide whether to intervene but has not yet done so. Notwithstanding the fact that in such cases the United States is the real party in interest as a result of the private relator's unilateral decision to file a complaint, the Supreme Court has explicitly held that the United States is not a "party" to a private relator's *qui tam* action unless and until it decides to intervene. *U.S. ex rel. Eisenstein v. City of New York, New York*, 129 S. Ct. 2230, 2233 (2009). As a result, the pendency of a sealed *qui tam* action in which the United States has not intervened is not a sufficient basis for concluding that the government and Amgen were parties to the same matter within the meaning of the

have escaped the government's attention, which erroneously asserts that "Model Rule 4.2 is *identical* to New York Rule 4.2[.]" USA. Memo. II at 4 n.1 (emphasis added).

[18] Even the caption of this action – which Amgen selected on its own – suggests the problem Amgen faces in seeking to have the no-contact rule apply to the instant facts. *See* DE 1 at 1 (caption describing Amgen as a "Putative Defendant").

no-contact rule. *See United States v. Joseph Binder Schweizer Emblem Co.*, 167 F. Supp. 2d 862, 865 (E.D.N.C. 2001) (finding that because government had not yet intervened in pending *qui tam* action, government agent's contact with corporate defendant's employee must be analyzed, for purposes of no-contact rule, in the procedural posture of the grand jury investigation).

b.      The Grand Jury Investigation

A subject or target of a grand jury investigation is not, by virtue of that status, a "party" to a "matter" within the meaning of the no-contact rule. *See Chan*, 271 F. Supp. 2d at 543. While I believe that proposition is firmly grounded in both the text of the rule and the case law of this circuit (and that of every other circuit, for that matter), I recognize that the applicable precedent is somewhat murky and therefore warrants some explanation.

In *United States v. Vasquez*, 675 F.2d 16, 17 (2d Cir. 1982), the circuit court wrote that it was "doubtful" that the no-contact rule applies at all in the context of a criminal investigation. Just a year later, however, the court assuaged its own doubts in that regard and held that the rule does apply in criminal cases. *United States v. Jamil*, 707 F.2d 638, 645 (2d Cir. 1983). That ruling set the stage for the decision in *United States v. Hammad*, 846 F.2d 854, *amended*, 858 F.2d 834 (2d Cir. 1988).

In *Hammad*, a prosecutor directed an informant to speak with, and record the statements of, Taiseer Hammad, the target of an investigation whom the prosecutor knew to be represented by counsel. 858 F.2d at 837. After Hammad was indicted, he asked the district court to suppress the recordings of his statements to the informant on the ground that they were the product of the prosecutor's violation of the no-contact rule. This district court granted the motion. On the government's appeal, the circuit court held that the rule applied to the circumstances of the case,

and further ruled that the prosecutor had violated the rule, but reversed the suppression remedy as unwarranted because of prior uncertainty of the law in this area. *Id.* at 842.[19]

In its opinion, the *Hammad* court dwelled at some length on the applicability of the no-contact rule, as a matter of timing, prior to the attachment of a defendant's Sixth Amendment right to counsel. *Id.* at 838. It did not address at all, however, the distinct but related concept of whether the fact that an investigative target is not a formal "party" to a grand jury proceeding had any limiting effect on the rule's applicability. Thus, the holding in *Jamil* that the rule applies to criminal cases led to an implicit and unexplored assumption in *Hammad* that the represented investigative target was a "party" to a "matter" within the rule's meaning.

If *Hammad* were the last word on the subject in this circuit, I would assume – despite the opinion's lack of discussion on the subject – that the government's non-custodial, pre-indictment interviews of Amgen employees fall within the scope of Rule 4.2, at least within this circuit,[20] and proceed directly to the government's argument as to why such contacts are authorized by law. But subsequent developments make such reliance on *Hammad* untenable. In particular, the holding and reasoning in *Simels* preclude a finding that Amgen is a party to the grand jury's investigation for purposes of Rule 4.2.

---

[19] The court initially held that the prosecutor violated the rule simply by using the informant to engage in communications with Hammad without the consent of Hammad's counsel. 846 F.2d at 859-60. On rehearing, the court considerably narrowed the basis for its holding: it explained that the use of an informant to communicate with Hammad was, standing alone, an investigative technique authorized by law, and therefore permitted under the no-contact rule. 858 F.2d at 839. It went on to find, however, that the prosecutor's conduct in arming the informant with a sham subpoena to show to Hammad as a way of eliciting incriminating statements was not authorized, and therefore deprived the prosecutor's indirect communication with Hammad of the protection it would otherwise have enjoyed under the no-contact rule. *Id.*

[20] The implicit assumption to that effect in *Hammad* is at odds with the case law of every other circuit to have addressed the issue. *See*, *e.g.*, *United States v. Balter*, 91 F.3d 427, 435-36 (3d Cir. 1996); *United States v. Ryans*, 903 F.2d 731, 735-36 (10th Cir. 1990) (citing cases); *see also Federal Criminal Practice: A Second Circuit Handbook*, § 10-2 at 174.

*Simels* involved a disciplinary proceeding against Robert Simels, who was at the time a prominent criminal defense attorney in New York.[21] Simels represented Brooks Davis in a drug conspiracy case. Days before the scheduled start of Davis's trial, a cooperating accomplice witness was shot. The government swiftly identified Aaron Harper as the assailant and announced – in the context of seeking an anonymous jury for Davis's trial – that it planned to charge both Harper and Davis, among others, with attempting to murder the witness. Both Harper and Davis were incarcerated at the same detention facility, and the two men spoke. Following that conversation, Davis asked his attorney Simels to interview Harper. Despite knowing that Harper was represented by counsel, Simels spoke to Harper and secured from him an affidavit. As a result of that conversation, when Harper testified as a cooperating government witness at the drug conspiracy trial of Davis and his co-defendants, the co-defendants sought to call Simels as a witness to impeach Harper's testimony, resulting in Simels' disqualification and the declaration of a mistrial. *See Simels,* 48 F.3d at 642-43; *Chan* 271 F. Supp. 2d at 541-42 (summarizing *Simels* and including some factual details not set forth in the latter appellate opinion).

The Grievance Committee of the Southern District of New York voted to censure Simels for violating the no-contact rule. On appeal, the circuit court reversed, holding that Harper was not a "party" in the same "matter" as Simels and Davis for purposes of the no-contact rule. 48 F.3d at 645. In reaching that decision, the court expressly stated that it was interpreting the no-contact rule narrowly so as to vindicate both "a defendant's right to the effective assistance of counsel and the public's interest in effective law enforcement." *Id*. It also noted that in prior cases considering application of the no-contact rule to federal prosecutors, it had "not been asked to examine the

---

[21] Simels was later disbarred following his conviction on charges related to witness tampering and obstruction of justice arising from a separate case. *See United States v. Irving*, 682 F. Supp. 2d 243 (E.D.N.Y. 2010).

precise scope of the terms … 'party' or 'matter.'" *Id*. at 647. Finally, it dispensed with *Hammad* by describing the court in that case as having done no more than "assumed, *a priori*, that there were adverse parties" in the case. *Id*. at 649.

Having thus cleared away the precedential brush to permit a policy-based resolution of the matter, the court held that a narrow reading of "party" and "matter" is critical to allow "the investigation essential to a defense attorney's preparation for trial." *Id*. at 650. Indeed, the court expressed the concern that a broader reading of those terms – a reading broad enough to sustain the proposed censure of Simels – "might well bar defense counsel from contacting represented co-targets during the investigative phase of a large conspiracy." *Id*. at 651. Moreover, the court did not restrict its concern about the interpretation of "party" and "matter" to the potential effects of its decision on criminal defendants; instead, it explicitly acknowledged that the case "raise[d] policy issues that should be resolved against the backdrop of federal law enforcement concerns." *Id*.

Thus, as the court recognized in *Chan*, the "statements in *Simels* strongly counsel that [courts] apply the [no-contact] rule only to matters that fall literally within its scope." 271 F. Supp. 2d at 543. The circumstances here do not fall within that literal scope: there are no "parties" to a grand jury investigation because it is an inquisition, not an adversarial proceeding. "The term 'party' means '[o]ne by or against whom a lawsuit is brought,' Black's Law Dictionary 1144 (7th ed. 1999); and a lawsuit is defined as '[a]ny proceeding by a party or parties against another in a court of law.' *Id*. at 1148 (defining 'suit')." *Chan*, 271 F. Supp. 2d at 542 (emphasis omitted).

*Simels* and *Chan* thus demonstrate that, notwithstanding the broad reading of "party" and "matter" that the *Hammad* court assumed without discussion, New York's version of the no-contact rule does not prohibit a prosecutor from communicating directly with an investigative

subject prior to the beginning of an adversary court proceeding. In advocating a different conclusion Amgen relies not only on the reasoning in *Hammad* – which, as explained above, is untenable in light of later decisions in this circuit – but also on the reasoning in *United States v. Talao*, 222 F.3d 1133 (9th Cir. 2000). In the latter case, the court explicitly relied on *Hammad* to conclude that the no-contact rule applied in the investigative context, even before indictment, when the government and the investigative subject "had clearly taken adversarial positions." *Id*. at 1139.

Of course, reliance on *Talao* in *all* respects might not favor Amgen in any event, as the court found that the prosecutor in that case did not violate the no-contact rule by speaking with an employee of the company under investigation. *Id*. at 1140. Moreover, Amgen explains neither how a court is to determine when a corporation and the government have assumed sufficiently "adversarial positions" to trigger this interpretation of the rule, nor how any such standard might apply to the facts here. Indeed, Amgen repeatedly emphasizes in its submissions how cooperative it has been with the government's investigation and how eager it is to continue such cooperation. Motion ¶ 3; Amgen Memo. I at 2-3. In addition, the fact that the government has repeatedly passed up opportunities to intervene in private relators' lawsuits against Amgen further undermines the proposition that the litigants here are in an adversarial stance at all, much less the sufficiently adversarial position to warrant interpreting "party" and "matter" to mean something other than "party" and "matter." Certainly the pendency of a grand jury investigation, without more, does not in any way suggest that the government views Amgen as an adversary: "the grand jury 'can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not.'" *United States v. R. Enters., Inc.*, 498 U.S. 292, 297 (1991) (quoting *United*

*States v. Morton Salt Co.*, 338 U.S. 632, 642-643 (1950)). More fundamentally, whatever merit Amgen's reliance on *Talao* may have in the abstract, it simply fails to take into account that *Talao* expressly relies on a part of *Hammad* that *Simels* later showed to be no more than an assumption – and one that the court necessarily rejected in deciding *Simels* as it did.

Following *Simels* rather than *Hammad* and *Talao* is also more consonant with the inquisitorial (rather than adversarial) nature of grand jury proceedings. The subject or target of a grand jury proceeding is not in any meaningful sense a "party" to that proceeding: he has no right to be heard, *see United States v. Ciambrone*, 601 F.2d 616, 622-23 (2d Cir. 1979); he has no right to be present (except as a witness while testifying), *see* Fed. R. Crim. P. 6(d); and he has no right to obtain access to evidence provided by others or learn of the results of the investigation, *see* Fed. R. Crim. P. 6(e)-(f). Even more fundamentally, the target of a grand jury investigation has no right to know of its existence; to the contrary, the investigation is meant to proceed entirely in secret. *See*, *e.g.*, *Williams*, 504 U.S. at 48; *R. Enterprises, Inc.*, 498 U.S. at 299 (rejecting subpoena recipient's effort to challenge subpoena on relevance grounds in part because allowing such challenges "threatens to compromise 'the indispensable secrecy of grand jury proceedings'") (quoting *United States v. Johnson*, 319 U.S. 503, 513 (1943)). If a corporate target were considered a party to the grand jury investigation, the grand jury – which properly enlists the assistance of government attorneys who advise it and secure evidence on its behalf – would face the dilemma of prematurely breaching investigative secrecy or foregoing important sources of evidence about the corporation's conduct. Accordingly, I conclude that Rule 4.2 does not apply in the circumstances presented here because Amgen and the United States were not both parties to the same matter within the meaning of that rule.

3.      "Authorized By Law"

The government does not pause to parse the application of such terms as "party" and "matter" because it contends it holds a trump card: its overt investigative communications with Amgen employees are "authorized by law" and therefore permitted under Rule 4.2. USA Memo. I at 4-5. Certainly the proposition is consistent with controlling case law: *Hammad* (in its final version) explicitly holds that as a general matter, a prosecutor may make pre-indictment investigative contacts with a represented target. 858 F.2d at 840; *see also Simels*, 48 F.3d at 649; *United States v. DeVillio*, 983 F.2d 1185, 1192 (2d Cir. 1993). But the matter is not quite so simple: although the court in *Hammad* said that such investigative contacts are indeed normally authorized by law, it did not identify the "law" that authorizes them. Nor has any case since *Hammad*, to my knowledge, solved the mystery: later cases cite *Hammad* itself for the proposition that pre-indictment investigative contacts are authorized by law. *See*, *e.g. DeVillio,* 983 F.2d at 1192; *United States v. Nouri*, 611 F.Supp.2d 380, 384 (S.D.N.Y. 2009).

Accordingly, when the government asserted that its prosecutors engaged in conduct authorized by law, I asked them the natural question: what law? Unable to provide the answer at oral argument, *see* Tr. at 50-55, the government sought to shed light on the matter in its supplemental briefing. It came up with six candidates: Federal Rules of Criminal Procedure 6 and 7; Sections 516, 533, and 547 of title 28, United States Code; and the "Take Care" Clause of Article II of the United States Constitution. *See* USA Memo. II at 2-4. As explained below, none of those provisions purports to authorize the kind of communications at issue here.

As a threshold matter, I note that the issue here is not foreclosed by the court's analysis in *O'Keefe II*. Although the sources of authority that the government cites here overlap to a

significant degree with the authorities it cited in *O'Keefe II*, the two cases involve significantly different issues. In *O'Keefe II*, the government contended that it was "authorized by law" to contact represented employees by virtue of a regulation the Justice Department had issued explicitly permitting such contacts notwithstanding the contrary provision of any state's no-contact rule. 132 F.3d at 1254. The question in that case was therefore *not* whether the cited regulation actually authorized the contact at issue – it plainly did – but rather whether the Attorney General had legal authority to promulgate that regulation. The government cited several authorities as a basis for the Attorney General's power to issue the rule, including some of the statutes it cites here, *id.*, but the court ruled that none of those laws empowered the Attorney General to write a rule that, by its terms, purported to trump state ethics rules. *Id.* at 1257. Largely as a result of that ruling, and of the McDade Act that Congress passed soon after, the regulation on which the government relied in *O'Keefe II* is no longer in effect. In this motion, accordingly, the government is not seeking to identify a law that allows the Attorney General to dispense with state ethics rules, it is instead seeking to identify whatever law it was that the *Hammad* court had in mind when it held that such rules affirmatively allow the kind of conduct at issue here. As explained below, I conclude that none of the laws on which the government relies fits that description.

Federal Rule of Criminal Procedure 6 relates to the grand jury. It is entirely silent about the investigative techniques the government may (or may not) use in securing evidence to present to the grand jury. Federal Rule of Criminal Procedure 7 likewise does nothing to authorize or prohibit investigative communications; instead, it governs the form of charging instruments without in any way providing guidance as to how the government should go about securing evidence sufficient to lodge such charges.

The statutes in title 28 of the United States Code on which the government relies are no more illuminating. Section 516 reserves to Justice Department officers the duty of conducting litigation on behalf of the United States and its officers; it says nothing about how those attorneys may or may not go about collecting evidence to be used in such litigation. Section 533 authorizes the Attorney General to appoint inferior officers – such as Assistant United States Attorneys and federal law enforcement agents – "to detect and prosecute crimes against the United States" and "to conduct … other investigations regarding [certain] official matters[.]" 28 U.S.C. § 533(1), (4). The statute provides no guidance as to what such attorneys and agents may or may not do in detecting crimes or conducting investigations. Finally, Section 547 specifies the duties of United States Attorneys but it does not endorse or prohibit any particular conduct in the performance of such duties. Indeed, somewhat surprisingly given the reliance the government places on it here, the latter statute does not even provide that the investigation of potential crimes – as opposed to the prosecution of offenses revealed by such investigation – is among a United States Attorney's enumerated duties. The statutes on which the government relies therefore do not suffice to bring the conduct at issue here within the "authorized by law" exception to Rule 4.2. *See United States v. Lopez*, 4 F.3d 1455, 1461 (9th Cir. 1993) (rejecting government's reliance on similar list of statutes to authorize communications with represented defendant under California's version of the no-contact rule).

In fairness, the government does not assert that any of the cited statutes or rules explicitly authorizes the investigative communications about which Amgen complains. Instead, the government argues that the authorities they cite empower federal prosecutors, working in conjunction with investigative grand juries, to exercise "broad discretion to enforce the Nation's

criminal laws.'" *See* USA Memo. II at 3 (quoting *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (internal citations and quotations omitted)). The government then adds that "the *Armstrong* Court explained that prosecutors have this broad latitude because they are designated by statute as the President's delegates to help him discharge his constitutional responsibility to 'take Care that the Laws be faithfully executed.'" *Id*. (citing *Armstrong*, 517 U.S. at 464 (citing U.S. Const., Art. II, § 3); 28 U.S.C. §§ 516, 547).

I believe there are two problems with the latter argument. First, it proves too much: if the legal framework that confers on prosecutors "broad discretion to enforce the Nation's criminal laws" suffices to "authorize" *specific* investigative techniques that prosecutors deem appropriate to the performance of their duties – an authorization that trumps the otherwise applicable prohibition in Rule 4.2 – it is hard to imagine any technique that cannot be defended on similar grounds provided the prohibition against such a technique is not likewise grounded in the Constitution. But if the government does not intend its argument to reach so far, then I do not understand how the broad enforcement discretion of prosecutors authorizes them to override one non-constitutional prohibition but not others. The authorities the government cites are so non-specific that they "authorize" virtually everything or virtually nothing.

Second, once the government predicates its reliance on the Take Care Clause, the statutes and rules it layers on top add nothing of substance to its authorization argument. But the Take Care Clause can only take the government so far – and not nearly as far now as it did prior to the advent of the McDade Act.

I agree with the government's reading of *Armstrong* that, pursuant to the Take Care Clause, the President (and the executive branch officers to whom he assigns law enforcement duties) have

an obligation to enforce the laws and a corresponding right to investigate their violation. But to the extent that constitutional mandate confers on executive branch officers the authority to take such investigative steps as they deem appropriate, that authority is necessarily residual: it exists only so long as, and to the extent that, Congress does not see fit to limit it. Once Congress decides, in an appropriate exercise of its legislative authority that the President endorses, that a particular kind of executive action is to be prohibited or regulated, all federal officers must comply with that directive. Indeed, such a prohibition becomes one of the laws that the executive branch must take care to enforce.

Thus, even if federal prosecutors would have the authority, in the absence of Congressional action, to ignore state disciplinary rules and conduct interviews otherwise regulated by a state's no-contact rule – that is, even if *O'Keefe II* was wrongly decided[22] – the McDade Act (enacted shortly after the decision in *O'Keefe II*) would foreclose the government's ability to rely on the Take Care Clause as a source of authority for the specific conduct at issue here. In passing the McDade Act, Congress made the policy decision to delegate a significant measure of control over the conduct of federal prosecutors to the rule-making authorities of each state. New York having promulgated the no-contact rule, the residual power to conduct law enforcement investigations inherent in the Take Care clause cannot suffice to authorize a form of contact that New York's rule forbids.

Accordingly, I cannot identify any constitutional provision, statute, or rule that *now* authorizes the communications about which Amgen complains. *Hammad* however, was written

---

[22]  Because the issue in *O'Keefe II* was whether the Justice Department had authority to issue a regulation purporting to authorize investigative contacts with represented persons (the "Thornburgh Memo") and not whether any particular investigative techniques are themselves consistent with the no-contact rule, the court in that case did not have occasion to consider the Take Care clause.

prior to the McDade Act's passage. Accordingly, at the time the case was decided, the government's reliance on the residual authority of the Take Care Clause had more force and may well have explained the *Hammad* court's conclusion that the communications at issue there were authorized by law.

The latter conclusion is not enough to end the analysis of the instant issue. Assuming *Hammad* correctly identified sufficient authority for prosecutors to communicate with represented targets as of 1988, such authority appears to have ended with passage of the McDade Act a decade later. Nevertheless, for two related reasons, I conclude that the prosecutors' conduct here remains "authorized by law" notwithstanding the advent of the McDade Act.

First, the part of *Hammad* that found the prosecutor's communication with a represented target to be authorized by law continues to be good law in this circuit, even after passage of the McDade Act. *See*, *e.g.*, *Simels*, 48 F.3d at 649; *DeVillio*, 983 F.2d at 1192; *In re Chan*, 271 F.Supp.2d at 543; *see also* Loc. Civ. R. 1.5(b)(5) (requiring court to follow binding federal case law in interpreting the New York code of conduct). Even if the rationale for the circuit court's holding in *Hammad* has evaporated, I am not free to recommend, and this court is not free to decide in the absence of clear controlling case law to the contrary, that *Hammad* has lost its dispositive authority.

Second, the meaning of "authorized by law" itself has changed over time in a way that lends renewed force to *Hammad*. In 2002, the American Bar Association amended the official commentary to its version of the no-contact rule to include the following: "Communications authorized by law may also include investigative activities of lawyers representing governmental entities, directly or through investigative agents, prior to the commencement of criminal or civil

enforcement proceedings." Model Rules of Prof'l Conduct R. 4.2 cmt. 5 (2002); *see also* Margaret

Colgate Love, *The Revised ABA Model Rules of Professional Conduct: Summary of the Work of*

*Ethics 2000*, 15. Geo. J. Legal Ethics 441, 467-69 (explaining the changes made to the rule as a

result of the ABA's Ethics 2000 Commission). It is of course true, as the government

acknowledges, that New York State did not adopt that commentary when it adapted Model Rule

4.2 for its own lawyers' code of conduct in 2009. *See* USA Memo. II at 4 n.1. But that means only

that New York has not definitively decided the matter in the government's favor – it does not mean

that New York has authoritatively foreclosed such an interpretation. As a result, this court is free to

adopt it in interpreting the rule, and should do so to vindicate the distinct federal interest in

effective law enforcement consistent with the vindication of defendants' procedural rights. *See*

*Simels*, 48 F.3d at 645-46; Loc. Civ. R. 1.5(b)(5) (providing for "due regard to decisions of the

New York Court of Appeals and other New York State courts," but only in the absence of

"significant federal interests").

The foregoing discussion explains why, in my view, *Hammad* remains binding precedent

for the proposition that a prosecutor is authorized by law to engage in *covert* pre-indictment

communications with the represented target of an investigation. Amgen contends that that does not

suffice to defeat its motion: it argues that even against the backdrop of such law, a prosecutor is not

similarly authorized to have a law enforcement agent conduct an *overt* interview of a represented

investigative target. Amgen Memo. II at 19-20. To be sure, the case law does not explicitly reject

such a distinction, and *Hammad* made clear that the determination of the sorts of conduct deemed

to be authorized by law must be made on a case-by-case basis. 858 F.2d at 840. Nevertheless, I

reject the distinction on which Amgen relies for two reasons.

First, to the extent that the no-contact rule is designed to protect "a defendant from the danger of being tricked into giving his case away by opposing counsel's artfully crafted questions[,]" *Simels*, 48 F.3d at 647 (quoting *Jamil*, 707 F.2d at 646 (internal quotation omitted)), it is by no means apparent that Amgen faces a greater risk from overt agent interviews of its employees – interviews that Amgen is in any event professedly eager to facilitate, *see* Kendall Dec. ¶¶ 8, 12 – than from covert approaches to such employees by informants. Second, *Simels* teaches that the no-contact rule is not a source of rights but a standard of courtesy. *See* 48 F.3d at 647. While the prosecutorial conduct at issue here may be discourteous to Amgen's counsel, it is certainly no less courteous than the covert use of informants. Indeed, if anything, the transparency of the government's position is more consonant with both views of the no-contact rule than the covert use of informants: it gives Amgen's counsel more notice of the risk it faces and enables counsel to provide Amgen's employees with such instructions as the company deems appropriate about how to respond to an agent's inquiry, and it does counsel the courtesy (as the use of informants does not) of candor.

Accordingly, I respectfully recommend that if the court reaches the merits of Amgen's motion, it should find that the prosecutorial conduct of which Amgen complains does not violate Rule 4.2. Amgen is not a party to whom the rule's protection applies under the circumstances of this motion, and the government's investigative actions are in any event authorized by law.

C.      <u>The Proposed Remedy</u>

If, consistent with my analysis, the court concludes that Amgen has failed to establish a justiciable violation of Rule 4.2, it need not consider any remedy. However, even if the court disagrees with that analysis and finds a violation of the no-contact rule, I nevertheless recommend

against granting the relief Amgen requests. As explained below, Amgen seeks relief on behalf of the wrong beneficiaries, against the wrong subjects, and in the wrong forum.[23]

       1.    <u>Beneficiaries Of The Proposed Remedy</u>

In arguing that the government has violated Rule 4.2, Amgen asserts that "Amgen's current employees are represented parties within the meaning of the no-contact rule." Amgen Memo. I at 12. That is at best uncertain, and in many cases likely untrue; it is in any event assuredly not a basis for granting any relief to Amgen. It is the latter company itself that is the represented party at issue here; its employees may or may not properly be considered to stand in Amgen's shoes for purposes of the rule when the government contacts them, but they are not themselves represented parties in their individual capacities (except to the extent individual employees have private counsel, and there is no suggestion that the government has sought to avoid notice to such attorneys in contacting any employee).[24] At first blush, the distinction appears to be merely semantic – but

---

[23] The following discussion explains why I believe the protective order Amgen requested in its notice of motion is not warranted. *See* Motion at 1. In a later submission, Amgen suggested that the relief it seeks is instead

> a declaratory judgment from this Court that a) the no-contact rule applies to the conduct of USAO [United States Attorney's Office] attorneys as part of their joint civil and criminal investigation of Amgen and b) that the "authorized by law" exception fails to exempt the USAO attorneys from the no-contact rule due to the lack of any authorizing statute and for lack of any demonstrated investigatory necessity.

Amgen Memo. II at 21. Even assuming the court finds that Amgen has demonstrated a violation of Rule 4.2 in the circumstances here, I recommend against a declaratory judgment because of the availability of more appropriate remedies discussed below. In any event, at least part of the declaration Amgen seeks is incorrect: although the parties agree (and the McDade Act makes plain) that the no-contact rule applies to the conduct of federal prosecutors in the conduct of their duties, it is not true that a communication may be "authorized by law" only if it is allowed under a statute or if there is a "demonstrated investigatory necessity." As discussed above, other sources of law may and do suffice.

[24] Indeed, each of the authorities that Amgen cites in support of its argument on the point makes that point clear. *See Miano v. AC & R Advertising, Inc.*, 148 F.R.D. 68, 76-77 (S.D.N.Y. 1993)

36

Amgen quickly makes clear that its mistake is more substantive: shortly after making the latter assertion, Amgen insists that the relief it seeks "is necessary for Amgen to protect its employees' rights against self-incrimination" and will allow it to "ensure that its employees have an opportunity to have counsel of their choice present – if they seek counsel at all – for any interview with the government." *Id*. at 13.[25]

Leaving aside the obvious problem that Amgen has no standing to litigate the rights of its employees, *see Kowalski v. Tesmer*, 543 U.S. 125, 136 (2004) (quoting *Barrows v. Jackson*, 346 U.S. 249, 255 (1953) (setting out the general rule that a party does not have standing to vindicate the constitutional rights of a third party)), there is simply no reason to think that Amgen's assertion has any relation either to the facts or to the issue before the court. If the government provides notice to Amgen's counsel of its desire to interview an Amgen employee, that notification will do nothing to protect the *employee's* privilege against self-incrimination. That privilege will exist, and be enforceable by the employee, regardless of the involvement of Amgen's counsel, and there is no reason based on the facts in the record to suggest that the government will in any way seek to compromise that right.

Moreover, it is doubtful that Amgen's counsel could do anything to vindicate the employee's personal rights in any event: in a setting where an individual employee is in a position

---

(cited in Amgen Memo. I at 12 n. 24); *Niesig*, 76 N.Y.2d at 371-75 (same); *Meachum v. Outdoor World Corp.*, 171 Misc. 2d 354, 360-63 (N.Y. Sup. Ct. 1996) (same); Rule 4.2 cmt. 7 (same).

[25]  Amgen also argues that the relief it requests is needed to "preserve Amgen's right to counsel." *Id*. While that statement at least identifies a more apt beneficiary of Amgen's efforts, it is even more plainly wrong: Amgen has not yet been "accused" of anything for purposes of the Sixth Amendment, and therefore has no right to counsel that the government's investigative techniques can jeopardize. Moreover, as discussed above, the law of this circuit rejects the proposition that Rule 4.2 is designed to protect the right to counsel; to the contrary, *Simels* holds that the rule is instead one of "professional courtesy." *Simels*, 48 F.3d at 647; *see also Chan* 271 F. Supp. 2d at 543.

to attest to facts that would incriminate both himself and his employer, the employer's counsel labors under a conflict of interest in advising the employee about the exercise of his right to silence, and likely violates his ethical obligation by suggesting the employee invoke that privilege. *See*, *e.g.*, N.Y. Rules of Prof'l Conduct 4.3, 22 N.Y.C. R.R. § 1200 ("The lawyer shall not give legal advice to an unrepresented person other than the advice to secure counsel if the lawyer knows or reasonably should know that the interests of such person are or have a reasonable possibility of being in conflict with the interests of the client."); Bruce L. Green, *Zealous Representation Bound: The Intersection of the Ethical Codes and the Criminal Law*, 69 N.C. L. Rev. 687, 696 (1991) ("When an attorney not only advises a prosecution witness that he has a fifth amendment right, but also urges the witness to assert that right, his conduct is more difficult to defend.").

### 2. Subjects Of The Proposed Remedy

Amgen does not seek relief against any particular attorneys who have allegedly violated the no-contact rule. Instead it seeks relief against the government as such and against the United States Attorney in her official capacity. Motion ¶ 7; Tr. at 11. As explained below, neither proposal is appropriate.

### a. The Government

Amgen asks the court to remedy misconduct allegedly committed by individual attorneys by imposing a sanction against the client those attorneys represent: the sovereign government of the United States. Moreover, the relief Amgen seeks would bind that client rather than counsel; specifically, Amgen seeks to bar "the government" as such from contacting its employees without first notifying corporate counsel. *See*, *e.g.*, Amgen Memo. I at 7 ("this motion is not directed at any

individual Assistant United States Attorney, but rather at the government's interpretation of the ethics rule"). Such request fundamentally misperceives the nature of the rule it invokes.

Amgen's position is crystallized in its assertion that, "[w]ithout a doubt, *the government* is bound by the State of New York ethics rules and, in particular, … Rule 4.2[.]" *Id*. at 7-8 (emphasis added). Far from being indubitable, I believe the assertion is plainly incorrect: the federal government, as such, is not bound by the attorney "ethics rules" of New York or any other state or federal jurisdiction. Rule 4.2 is part of a code of professional conduct that governs the behavior of individuals who practice law; it does nothing to constrain the rights of the government or any other client, nor is it a source of rights for any adversary. *See*, *e.g.*, Rule 4.2 (reciting prohibition of certain communications by "a lawyer" made in the course of "representing a client"); Amgen Memo. I at 8 ("The no-contact rule prohibits *an attorney*" from making certain types of communication) (emphasis added). In this sense, I respectfully disagree with the ruling in *O'Keefe II*, which affirmed a protective order against the government as such. Because the no-contact rule is aimed exclusively at the conduct of attorneys as individual professionals, and not at the clients they represent, I believe there is no lawful basis to order relief against the government as such on the basis of a violation of Rule 4.2.[26]

---

[26] In *Hammad* the district court ordered the suppression of evidence for the violation of the no-contact rule. In reversing that decision, the court of appeals concluded that the prosecutor had violated the rule, but that he did not have reason to understand that his conduct was not authorized by law. As far as I am aware, no court in this circuit has since imposed any sanction on the government as such for the violation by one of its attorneys of Rule 4.2 – let alone a sanction that purported to subject the government as an institution to the constraints of the rule. *See also Lopez*, 4 F.3d at 1464 (finding that district court abused its discretion in dismissing an indictment as a sanction for violation of the no-contact rule, and opining that "when there is no showing of substantial prejudice to the defendant, lesser sanctions, such as holding the prosecutor in contempt or referral to the state bar for disciplinary proceedings" suffice as a remedy).

b.    <u>The United States Attorney</u>

As a fallback position, Amgen suggests that the court should enjoin the United States

Attorney, in her official capacity "as the administrator and supervisor of the [United States

Attorney's] office" for the Eastern District of New York. Tr. at 11. In doing so, Amgen makes clear

that it seeks relief because of its disagreement with "an office policy, as opposed to singling out an

individual Assistant" United States Attorney. *Id*. The clarification is revealing: by challenging a

"policy" of a component of the United States Department of Justice, Amgen seeks to constrain the

government as such from interviewing its employees without prior notification to corporate

counsel.

Amgen's position is not that the United States Attorney, as an attorney individually subject

to New York's rules of professional responsibility – including Rule 5.1, regarding the supervision

of junior attorneys in a law firm – has been lax in her supervision of the lawyers who assist her.

Instead, Amgen identifies the United States Attorney as the government official to whom an order

should be directed because of the nature of that official position. It thus appears that even if the

current United States Attorney who actually supervised the lawyers conducting the instant

investigation were to be replaced, Amgen would want the remedy they seek to bind her successor –

who plainly could not be deemed personally responsible for the prosecutors' past conduct. In doing

so, Amgen merely seeks to put a different label on its attempt to use a rule of professional conduct

aimed at attorneys in their individual capacity to constrain the policy choices available to the

government as such. Accordingly, for the same reason that I recommend against a remedy that

binds the government as a whole, I also recommend against a remedy that enjoins any action by the

United States Attorney in her official capacity.

3.     Alternative Available Remedies

The prospective injunctive relief Amgen seeks against the government as such is unwarranted, for the reasons explained above. But while such remedies are the only ones reasonably available to this court in the procedural posture in which Amgen has filed its motion, that does not mean that Amgen is without recourse. To the contrary, there are several alternative avenues of relief available to Amgen, each of which is better suited to enforcement of Rule 4.2 than the remedies sought here. First, to the extent any attorney admitted in New York has violated the rule, that attorney is subject to professional discipline by state authorities, and there is nothing that constrains Amgen from taking its complaints about the prosecutors to such tribunals.[27]

Second, every attorney whose conduct is at issue here is a federal prosecutor admitted to practice in this district, and is therefore subject to discipline by this court's Committee on Grievances – based either on an independent finding that the attorney has violated the no-contact rule, or on a finding to that effect by state disciplinary authorities. *See* Loc. Civ. R. 1.5(b)(2), (5). Again, nothing stops Amgen from making such a complaint.

Third, because every one of the attorneys at issue here is a federal prosecutor, each is subject to internal discipline by the Department of Justice for any violation of that agency's policy

---

[27]  In seeking to obtain relief against the government as a whole, Amgen has not troubled itself to demonstrate that any of the attorneys whose conduct is at issue here is a member of the New York bar. There is certainly no reason to assume that an attorney is so admitted simply by virtue of her admission to the bar of this federal court or by virtue of her official position as an Assistant United States Attorney in this district. *See* Loc. Civ. R. 1.3(a) (allowing for admission of attorneys other than those admitted in New York); 28 U.S.C. §§ 515(a), 518(b) (allowing Attorney General to direct any Justice Department officer to conduct any legal proceeding and appear in any court). However, in the unlikely event that none of the prosecutors involved in this case is admitted in New York, each plainly engages in duties in New York, and is therefore subject to the state's disciplinary authority pursuant to the McDade Act. *See*, *e.g.*, *United States v. Straub*, 1999 WL 33495606, at *7 (N.D. W. Va. June 14, 1999 (holding that the McDade Act requires compliance by federal prosecutor not admitted in West Virginia with the West Virginia Rules of Professional Conduct and disqualifying prosecutor from practice in West Virginia until licensed there).

– including the regulation that implements the McDade Act. *See* 28 C.F.R. § 77.3. Nothing

prevents Amgen from complaining to the Justice Department's Office of Professional

Responsibility. *See* USDOJ: Office of Professional Responsibility: How to File a Complaint,

http://www.justice.gov/opr/process.htm (last visited April 6, 2011).

Fourth, to the extent Amgen ever finds itself in the position of defending itself in litigation

brought by the United States in connection with the investigation at issue here, a finding by the

presiding judge that the government obtained evidence in violation of Rule 4.2 might support a

decision to suppress such evidence. *See Hammad*, 858 F.2d at 837; *but see, e.g.*, *Stern v. United*

*States Dist. Court for the Dist. Of Mass.*, 214 F.3d 4, 19 (1st Cir. 2000) ("it simply cannot be said

that Congress, by enacting section 530B, meant to empower states ... to regulate government

attorneys in a manner inconsistent with federal law").[28]

Each such remedy is more closely related to the purported violation at issue than the one

Amgen proposes. Simply stated, the government, as a sovereign institution, is entitled to solicit

information from Amgen's employees about crimes Amgen may have committed, regardless of

any professional constraints on the attorneys who comprise part – but only part – of the

government's investigative team. Neither Rule 4.2 nor any other rule of professional conduct can

alter that fact; only Congress, or the judiciary interpreting the federal law, has the authority to so

constrain the government's power to investigate crime. The remedy Amgen seeks would upset that

important balance and give Amgen the windfall of avoiding the effective investigation of its

---

[28] At oral argument, I asked Amgen's counsel why it did not take advantage of the fact that the
*Westmoreland* case had been unsealed to seek relief from the district court in that case – an effort
that would face none of the jurisdictional impediments discussed above in part II.A. *See* Tr. at 13.
The decision in *Stern* may suggest a reason Amgen determined such a course of action to be futile.

conduct.[29] In contrast, each of the alternative remedies described above is plainly available under existing law, and all of them together suffice to ensure that any attorney misbehavior is suitably deterred and punished and that Amgen's legitimate interests are vindicated.

In seeking to demonstrate that this court has jurisdiction to entertain its motion, Amgen protests that "[i]t simply cannot be the case that Amgen suffers an injury from the violation of a clear and defined rule of professional conduct, but lacks a forum for recourse." Amgen Memo. II at 13. That would indeed be a grave injustice – but it has nothing to do with the instant motion. Amgen has not yet suffered any injury from the conduct of which it complains, the rule it invokes is far from "clear and defined," and I conclude that the government has not violated it. But even if I am wrong on all of those points, Amgen has several ways to seek relief that do not require the Miscellaneous Judge to exercise authority this court does not have to cure a violation that has not occurred by ordering relief that is not available against a government that is not subject to the rule Amgen seeks to enforce. I therefore conclude that Amgen is not entitled to the relief it seeks.

III.    Recommendation

For the reasons set forth above, I respectfully recommend that the court dismiss Amgen's motion as non-justiciable or, in the alternative, deny it on the merits.

---

[29] I hasten to add that I do not intend to suggest that Amgen has engaged in any misconduct or has any reason to fear an investigation. However, if the remedy Amgen seeks were available in the circumstances here, the federal government would be deprived of an important, and unquestionably lawful, investigative tool that can deter or detect corporate misconduct by others. *Cf. Vasquez*, 675 F.2d 17 (expressing concern that a rule prohibiting pre-indictment conversations between a represented investigative target and a government informant "would simply enable criminal suspects, by retaining counsel, to hamper the government's conduct of legitimate investigations") (quoted in *Simels*, 48 F.3d at 647).

IV.     Objections

Any objections to this Report and Recommendation must be filed no later than April 25, 2011. Failure to file objections within this period designating the particular issues to be reviewed waives the right to appeal the district court's order. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); Fed. R. Crim. P. 59(b)(2); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).

**SO ORDERED.**

Dated: Brooklyn, New York
      April 6, 2011                                      /s/ James Orenstein
                                                         JAMES ORENSTEIN
                                                         U.S. Magistrate Judge